# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MARSHALL T. STEWART JR., Individually And On Behalf Of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>JOHN P. TAVLARIOS, JEFFREY D. PRIBOR, and PETER C. GEORGIOPOULOS<br><br>Defendants. | Civil Action No. **12 CIV 5046**<br><br>CLASS ACTION<br><br>COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS<br><br>JURY TRIAL DEMANDED |



1.      Plaintiff Marshall T. Stewart Jr., individually and on behalf of all other persons similarly situated, by his undersigned attorneys, alleges in this Class Action Complaint (the "Complaint") the following upon knowledge with respect to his own acts, and upon facts obtained through an investigation conducted by his counsel, which included, *inter alia*: (a) review and analysis of relevant filings made by General Maritime Corporation ("General Maritime" or the "Company") with the United States Securities and Exchange Commission (the "SEC"); (b) review and analysis of Defendants' public documents, conference calls and press releases; (c) review and analysis of securities analysts' reports and advisories concerning the Company; and (d) information readily obtainable on the Internet.

2.      Plaintiff believes that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Many of the facts supporting the allegations contained herein are known only to Defendants or are exclusively within their control.

## NATURE OF THE ACTION

3.      This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants, who purchased the common stock of General Maritime between May 10, 2010 and through and including November 16, 2011 (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws (the "Class").

## BACKGROUND

4.      General Maritime is a provider of international seaborne oil transportation services and it owns one of the world's largest fleets of tankers. Founded in 1991 by Peter Georgiopoulos ("Georgiopoulos"), General Maritime's fleet grew to thirty ships by 2001, the year it listed for trading on the New York Stock Exchange under the ticker "GMR." General Maritime is not a party to this action because it is in bankruptcy.

5.      The Company's financial position took a turn for the worse in mid-2010 when it endeavored to speculatively purchase seven large crude oil tankers for approximately $620 million, with the expectation that tanker earnings were about to improve.

6.      Instead, tanker earnings actually collapsed just as the transaction was completed. As a result, the Company took on debt that, unbeknownst to the investing public, was beyond its means.

7.      Defendants' scheme was to engage in a highly leveraged and speculative purchase of seven tankers - at the risk and expense of shareholders - based on management's opinion that tanker earnings would improve sharply. When tanker earnings actually declined, Defendants issued repeated false and misleading statements about the Company's liquidity and financial

2

condition in order to ensure that the Company's stock would trade at inflated levels until the tanker earnings rebounded in their favor.

8.      Notwithstanding Georgiopoulos's purported $2 billion net worth during the peak of the shipping boom, the Company, unbeknownst to the investing public, had significant liquidity problems, which it eventually hoped to redress with a $200 million capital injection from Oaktree Capital Management ("Oaktree").

9.      Throughout the Class Period, the Company and Defendants issued press releases, Form 10-Ks, Form 10-Qs, and conducted conference calls that were materially false and misleading, concerning the Company's liquidity, financial strength, and overall business prospects.

10.     Despite reporting repeated losses on a quarterly basis, and in the face of mounting evidence that the Company was at risk of not meeting its debt obligations, Defendants continued to paint a rosy picture of the financial condition of the Company throughout the Class Period, characterizing repeated concessions from banks as improvements in the Company's "financial flexibility" and liquidity.

11.     Finally, on November 17, 2011, the truth came out when General Maritime filed a Form 8-K with the SEC which stated that the Company had filed voluntary petitions for relief under Chapter 11 of the United States Bankruptcy Code.

12.     In light of the foregoing background, Plaintiff alleges that throughout the Class Period, Defendants disseminated materially false and misleading information and failed to disclose material facts and, as a result, the market price for General Maritime's common stock was artificially inflated during the Class Period, trading as high as $7.87 per share on June 11, 2010 according to *Bloomberg*.  Plaintiff and the other members of the Class acquired General

3

Maritime common stock during the Class Period at artificially inflated prices and were damaged thereby.

## JURISDICTION AND VENUE

13.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. § 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

14.    This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

15.    Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b) as a substantial part of the conduct complained of herein occurred in this District. General Maritime's principal executive offices were located at 299 Park Avenue, New York, New York and the Company's stock traded on the New York Stock Exchange ("NYSE") throughout the Class Period.

16.    In connection with the acts, conduct and other wrongs alleged herein, Defendants either directly or indirectly used the means and instrumentalities of interstate commerce, including but not limited to the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

17.    Plaintiff Marshall T. Stewart Jr. purchased General Maritime common stock during the Class Period and has suffered damages as a result as evidenced by his annexed certification.

18.    Defendant John P. Tavlarios ("Tavlarios") served as the Company's President, CEO, and as a Director at all relevant times.

19.     Defendant Jeffrey D. Pribor ("Pribor") served as the Company's Executive Vice President and Chief Financial Officer ("CFO") at all relevant times.

20.     Defendant Peter C. Georgiopoulos founded the Company and served as the Company's Chairman at all relevant times.

21.     Tavlarios, Pribor, and Georgiopoulos are collectively referred to hereinafter as the "Defendants."

22.     Each of the Defendants:

(a)     was directly involved in the day-to-day operations of the Company at the highest levels;

(b)     was privy to confidential proprietary information concerning the Company and its business and operations;

(c)     was involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(d)     was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and

(e)     approved or ratified these statements in violation of the federal securities laws.

23.     As officers, directors and controlling persons of a publicly-held company whose common stock is and was registered with the SEC pursuant to the Exchange Act, and was traded on the New York Stock Exchange and governed by the provisions of the federal securities laws, the Defendants each had a duty to disseminate accurate and truthful information promptly with respect to the Company's financial condition and to correct any previously-issued statements that

had become materially misleading or untrue to allow the market price of the Company's publicly-traded stock to reflect truthful and accurate information.

## NON-PARTY

24.    Non-party General Maritime was a provider of international seaborne oil transportation services incorporated in the Republic of the Marshall Islands with its principal executive offices at 299 Park Avenue, New York, New York, throughout the Class Period.

## SUBSTANTIVE FACTUAL ALLEGATIONS OF FRAUD

### The Company Issued Materially False and Misleading Statements Concerning its Liquidity and Financial Strength During the Class Period

25.    The Class Period begins on May 10, 2010, the day the Company filed an intentionally false and misleading Form 10-Q with the SEC for the first quarterly period, ended March 31, 2010, signed by Defendant Pribor. The filing contained certifications pursuant to Exchange Act Rule 13a-14(a)/15d-14(a) as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, and certifications pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley act of 2002, signed by Defendants Tavlarios and Pribor.

26.    Defendants Tavlarios and Pribor each signed substantially similar Section 302 and Section 906 certifications for each Form 10-K and Form 10-Q filed with the SEC, by the Company, during the Class Period (together "Sarbanes-Oxley Certifications").

27.    The May 10, 2010 filing stated, in pertinent part:

> While we expect to use our operating cash flows and borrowings to fund acquisitions, if any, on a short-term basis, we also intend to review other debt and equity financing alternatives to fund such acquisitions. Our business is capital intensive and its future success will depend on our ability to maintain a high-quality fleet through the acquisition of newer vessels and the selective sale of older vessels. These acquisitions will be principally subject to management's expectation of future market conditions as well as our ability to acquire vessels on favorable terms. We expect to rely

6

on operating cash flows as well as long-term borrowings and future equity offerings to fund our operations, make vessel acquisitions and implement our dividend policy and possible share repurchases. We believe that our current cash balance as well as operating cash flows and available borrowings under our credit facilities will be sufficient to meet our liquidity needs for the next year.

28.    The above statement was false and misleading in that Defendants knew and/or

recklessly disregarded the fact that the Company:

(a)    was planning on purchasing seven new tankers in the near future;

(b)    could not rely on operating cash flows, long-term borrowings, and future

borrowings, and future equity offerings to fund its planned vessel acquisitions; and it

(c)    did not have a sufficient cash balance, operating cash flows, or available

borrowings under its credit facilities sufficient to meet its liquidity needs for the next year.

29.    On June 9, 2010, the Company filed a Form 8-K signed by Defendant Pribor,

accompanied by a false and misleading press release, which stated in pertinent part:

General Maritime Corporation (NYSE: GMR) announced today that it has agreed to acquire five Very Large Crude Carriers (VLCCs) built between 2002 and 2010 and two Suezmax newbuildings from companies affiliated with the Metrostar Management Corporation for an aggregate purchase price of approximately $620 million. The acquisition is subject to financing conditions and the completion of customary documentation and closing conditions.

30.    The 8-K also contained the following statement from Defendant Tavlarios:

We are pleased to continue our tradition of entering into value-creating transactions for shareholders and have once again seized an attractive opportunity to consolidate the tanker market. With this acquisition, we expect to grow our high-quality fleet by approximately 50% on a tonnage basis, further improve the age profile of our fleet and increase our presence in the attractive VLCC market. General Maritime's exposure to a number of oil tanker subsectors and the product sector combined with its flexible fleet deployment strategy, position the Company to maximize long-term cash flow and achieve a level of stability in results.

7

31.     The above statement was false and misleading in that Defendant Tavlarios knew and/or recklessly disregarded the fact that the Company was having liquidity problems, and therefore, not only would it have trouble financing the transaction, but the new exposure to tankers would not maximize long-term cash flows or achieve stability.

32.     The 8-K also contained the following statement from Defendant Pribor:

> Since its inception, General Maritime has remained committed to actively consolidating the industry in a manner that meets a strict set of return criteria. In maintaining our disciplined approach, we have entered into an agreement to acquire seven modern vessels at a price we believe to be favorable and accretive to earnings per share and will increase the Company's long-term earnings power. We continue to receive support from world-class banks and have already obtained a commitment letter to finance up to 60% of this acquisition.

Defendant Pribor knew and/or recklessly disregarded the fact this purchase was not disciplined, but speculative as to future tanker earnings as well as the Company's ability to finance the transaction.

33.     On June 18, 2010, the Company filed a Form 8-K with the SEC followed by a June 23, 2010 press release stating in pertinent part:

> General Maritime Corporation ("General Maritime" or the "Company") (NYSE: GMR) announced today the closing of an offering by the Company of shares of the Company's common stock. The Company sold a total of 30,600,000 shares of newly issued common stock at a price to the public of $6.75 per share. The Company received net proceeds of approximately $195.6 million from the offering after deducting underwriting discounts and commissions and estimated offering expenses. The Company intends to use all of the net proceeds from the offering to fund a portion of the purchase price for its previously announced acquisition of seven tankers.

34.     On July 13, 2010, the Company issued a press release, which accompanied a Form 8-K and stated that under the terms of the amended Credit Facility, General Maritime

would be able to incur indebtedness under the proposed new $372 million senior secured credit facility previously announced by the Company, associated with the recently announced acquisition of seven vessels.

35.    The 8-K included the following false and misleading statement from Defendant Pribor:

> We are pleased to amend our Credit Facility under favorable terms and have taken proactive measures to ensure a financially stronger Company over both the near term and long term. We appreciate the ongoing support that we have received from global lending institutions and intend to maintain our strong banking relationships for the benefit of the Company and its shareholders.

36.    The above statement was false and misleading because Defendant Pribor knew and/or recklessly disregarded the fact that the Company had not taken proactive measures to ensure the financial strength of the Company and, in fact, had exposed the Company and its shareholders to significant risk by purchasing the tankers.

37.    On July 28, 2010, the Company issued a press release stating that the Company had recorded a net loss of $14.3 million for the quarter as compared to a $7.3 million profit for the same period in the prior year.

38.    The press release also contained the following false and misleading statement from Defendant Tavlarios:

> During the second quarter of 2010 and year-to-date, we entered into several important value-creating transactions, positioning the Company to grow its modern fleet, increase its earnings power and strengthen its balance sheet.  With our agreement to acquire seven double-hull tankers, we capitalized on attractive asset values and expect to expand our fleet by approximately 50% on a tonnage basis and further improve our age profile. With a flexible deployment strategy, a diverse service offering and an increased presence in the favorable VLCC market, we have positioned the Company to take advantage of future tanker rate increases while achieving a level of stability in our results.  As we focus on

9

> integrating the newly acquired vessels into the Company, we will
> continue to concentrate on providing leading international
> charterers with service that meets the highest operational
> standards."

39.     Far from being a "value-creating transaction," the speculative purchase of the

seven tankers without sufficient liquidity or resources would actually lead to the demise of the

Company.

40.     On July 29, 2010, the Company had a conference call addressing its second

quarter earnings announcement, during which Defendant Tavliaros made false and misleading

comments. Specifically, Tavliaros said, "acting decisively for shareholders, General Maritime

has once again taken important steps to meet critical objectives related to growing and

diversifying its modern fleet, significantly increasing the company's earning power and further

strengthening its balance sheet and financial flexibility."

41.     The above-statement was false and misleading in that the Defendant Tavliaros

knew and/or recklessly disregarded the fact that the Company had not strengthened its balance

sheet and flexibility and was, in fact, in a struggle for its survival.

42.     Later in the conference call, Defendant Tavliaros said:

> Most importantly to our shareholders, whatever the slope of the
> curve, General Maritime remains well positioned having entered
> 2010 with approximately 45% time charter coverage for the year.
> This enables us to maintain a strong balance sheet, pay down debt,
> and take advantage as we clearly did in the second quarter of
> acquisition opportunities while also leaving substantial opportunity
> to profit from raising rates.

43.     Defendant Tavliaros knew and/or recklessly disregarded the fact that the

Company did not have a strong balance sheet and, in light of its new tanker acquisition, would

not have the ability to pay down its debt.

10

44.      On August 9, 2010, the Company filed an intentionally false and misleading Form

10-Q quarterly report with the SEC, for the second quarter of fiscal year 2010, ended June 30,

2010, signed by Defendant Pribor, and containing Sarbanes-Oxley Certifications signed by

Defendants Tavlarios and Pribor. The Form 10-Q stated, in pertinent part:

> While we expect to use our operating cash flows and borrowings to
> fund acquisitions, if any, on a short-term basis, we also intend to
> review other debt and equity financing alternatives to fund such
> acquisitions. Our business is capital intensive and its future success
> will depend on our ability to maintain a high-quality fleet through
> the acquisition of newer vessels and the selective sale of older
> vessels. These acquisitions will be principally subject to
> management's expectation of future market conditions as well as
> our ability to acquire vessels on favorable terms. We expect to rely
> on operating cash flows as well as long-term borrowings and future
> equity offerings to fund our operations, make vessel acquisitions
> and implement our dividend policy and possible share
> repurchases.
>
> We expect to fund these payments through borrowings under our
> 2010 Credit Facility of $256.2 million and additional issuances of
> equity of $52.4 million depending upon market conditions. In the
> event that the Company determines to fund a portion of these
> payments using cash from operations, it plans to seek a waiver
> from the lenders under the 2010 Credit Facility to permit the
> Company to do so. Subject to the foregoing, we believe that our
> current cash balance as well as operating cash flows and available
> borrowings under our credit facilities will be sufficient to meet our
> liquidity needs for the next year.

45.      The above statement was false and misleading in that Defendants knew and/or

recklessly disregarded the fact that the Company could not pay its crushing debt and could not

meet its liquidity needs for the next year, especially in light of its reported net losses.

Disturbingly, the 10-Q again mentions the possibility of making vessel acquisitions.

46.      On October 5, 2010, the Company issued a press release which announced that it

had amended its $372 million senior secured credit facility, dated as of July 16, 2010. The

amended credit facility would waive, for a period of one year, the condition requiring the

issuance of new common equity to finance at least 40% of the purchase price for the acquisition of the seven vessels, without changing any other material terms. The press release also announced a $22.8 million bridge loan with Nordea Bank Finland plc.

47.    On October 27, 2010, the Company filed a Form 8-K with the SEC and issued an accompanying press release concerning its third quarter 2010 earnings, which stated that the Company recorded a net loss of $26 million compared to a net income of $14.8 million for the same period one year prior.

48.    On October 28, 2010, the Company had a conference call addressing its third quarter earnings announcement, during which Defendant Tavliaros made false and misleading comments. Specifically, Tavlarios said:

> Mostly importantly to our shareholders, whatever the slope of the curve, General Maritime remains well positioned with 50% time charter coverage, the balance of 2010 and approximately 40% coverage for 2011.
>
> This enables us to maintain the strong balance sheet and pay down debt, and also is leaving substantial opportunity to profit from rising rates.

49.    The above-statement was false and misleading in that the Defendant Tavliaros knew and/or recklessly disregarded the fact that the Company had not strengthened its balance sheet, did not have the ability to pay down its debt, and in fact, remained in a struggle for its survival.

50.    On December 22, 2010, General Maritime issued a press release which announced that the Company had entered into agreements to amend its $372 million senior secured credit facility and $750 million revolving credit facility.

51.    Under the terms of the amended credit facilities, the permitted Net Debt to EBITDA ratio was to increase to 8.75 times from the previous requirement of 6.0 times. This

12

new maintenance covenant ratio would be in effect for the 2010 fourth quarter through the 2011 third quarter. For the fourth quarter 2011 through the life of each facility, the maintenance covenant ratio would revert to 5.5 times.

52.      On January 18, 2011, General Maritime issued a press release which announced that the Company had entered into memoranda of agreement to sell three of its product tankers, and would receive net proceeds totaling $61.7 million for the sale of the three vessels. The sale would fulfill the requirement under the amended bridge loan, which was expected to be repaid in the current first quarter of 2011.

53.      On March 30, 2011, the Company filed a Form 10-K fourth quarter and full year 2010 financial results with the SEC, signed by Defendants Tavliaros, Pribor, and Georgiopoulos among others, and containing Sarbanes-Oxley Certifications signed by Defendants Tavlarios and Pribor.

54.      Contained in the Form 10-K is an independent report from the accounting firm of Deloitte & Touche LLP which purports to present fairly, the financial position of the Company.

55.      The report dubiously states that the "accompanying consolidated financial statements have been prepared assuming that the Company will continue as a going concern."

56.      The Deloitte & Touche report continues to state:

> [T]he Company requires additional financing in order to meet its debt obligations that will come due over the next year. In addition, the Company has current losses from operations, a working capital deficit and the expectation that certain of its loan covenants will not be achieved during 2011 without additional capital being raised, debt being refinanced or covenants waived or amended. These matters raise substantial doubt about the Company's ability to continue as a going concern. Management's plans concerning these matters are also described in Note 1. The accompanying consolidated financial statements do not include any adjustments that might result from the outcome of this uncertainty

13

57.     Also on March 30, 2011, the same day that the Company issued the 10-K referencing the Deloitte & Touche statement, the Company issued a press release which summarized the Company's fourth quarter and yearly results. The Company recorded a net loss for the three months ended December 31, 2010 of $167.2 million compared to a net loss of $52.9 million for the prior year period.

58.     In addition, the press release announced that it had reached deal with Oaktree whereby Oaktree would invest $200 million into the Company. The announcement stated in pertinent part:

> General Maritime also announced today that it has signed a credit agreement with an affiliate of Oaktree Capital Management, L.P. ("Oaktree") under which such affiliate will invest $200 million in Payment-in-Kind toggle floating rate secured notes ("Secured Notes") to be issued by certain subsidiaries of the Company.
>
> Concurrently, the Company announced that it has initiated a plan to refinance its 2005 revolving credit facility. It plans to enter into a new $550 million revolving credit facility...

59.     The press release also contained the following statement by Defendant Tavlarios, who commented on the Oaktree investment:

> During a very challenging year for the tanker market, General Maritime stayed focused on core principles that have served the Company well over time, and took decisive steps to enhance the Company's financial flexibility and strengthen its capital structure. Specifically, we continued to implement our flexible deployment strategy to effectively manage the Company's assets through the tanker economic cycles and increased our long-term earnings potential by growing our modern fleet. Management also strengthened the Company's balance sheet, culminating in the signing of an agreement with Oaktree Capital Management for a $200 million investment and a broader plan to refinance the Company's 2005 credit facility. These transactions are designed to provide shareholders and debtholders with a comprehensive financing solution. Further, we believe the important initiatives we implemented during 2010 and in early 2011 have bolstered our future prospects. Our large and diverse modern fleet, combined

14

> with our significant contracted revenue stream, positions General
> Maritime to achieve a level of stability in its results and benefit
> from potential improvements in tanker rates.

60.    The above statement by Defendant Tavlarios was false and misleading in that he knew and/or recklessly disregarded the underlying facts concerning the Company's financial condition which lead to the auditors' conclusions as presented in the Company's 10-K that very day, namely:

a.  the Company required additional financing in order to meet its debt obligations that would come due over the next year;

b.  the Company had a working capital deficit and the expectation that certain of its loan covenants would not be achieved during 2011 without additional capital being raised, debt being refinanced or covenants waived or amended; and

c.  there was a substantial doubt about the Company's ability to continue as a going concern.

61.    On May 10, 2011, the Company filed an intentionally false and misleading Form 10-Q quarterly report with the SEC, for the first quarter of fiscal year 2011, ended March 31, signed by Defendant Pribor, and containing Sarbanes-Oxley Certifications signed by Defendants Tavlarios and Pribor. The Form 10-Q stated, in pertinent part:

> We expect to rely on operating cash flows, long-term borrowings
> and potential future equity offerings to fund our operations. We
> believe that our current cash balance as well as operating cash
> flows and available borrowings under our credit facility will be
> sufficient to meet our liquidity needs for the next year.

62.    In a striking contrast with the auditors' report on the Company's 2010 year-end Form 10-K just over a month prior, the above statement is false and misleading in that Defendants knew and/or recklessly disregarded the fact that the Company could not meet its

15

liquidity needs for the next year, needed additional financing, had a working capital deficit, and was at risk of not continuing as a going concern.

63.     On May 11, 2011, the Company had a conference call addressing its first quarter earnings announcement, during which Defendant Tavliaros made false and misleading comments. Specifically Tavlarios stated, in pertinent part,

> Most importantly, to our shareholders, whatever the slope of the curve, General Maritime remains well positioned with approximately 43% coverage for 2011. This enables us to maintain a strong balance sheet while also leaving substantial opportunity to profit from rising rates.
>
> First, as we outlined on today's call, we made progress in strengthening our balance sheet and capital structure and, in doing so, increased the company's liquidity and financial flexibility while reducing our near-term cash requirements.

64.     Again, in a striking contrast with the auditors' report on the Company's 2010 year-end Form 10-K just over a month prior, the above statement is false and misleading in that Defendant Tavlarios knew and/or recklessly disregarded the fact that the Company did not have a strong balance sheet, could not meet its liquidity needs for the next year, needed additional financing, had a working capital deficit, and was at risk of not continuing as a going concern.

65.     On July 27, 2011, the Company issued a press release summarizing second quarter and six months 2011 financial results. The Company recorded a net loss of $36.8 million for the three months ended June 30, 2011 compared to a net loss of $14.0 million for the three months ended June 30, 2010.

66.     The press release also contained the following statement from Defendant Tavlarios, in pertinent part:

> General Maritime has continued to take important steps to strengthen its balance sheet and capital structure, which has enhanced the Company's ability to operate in a challenging market

16

> environment and improved its future prospects. During the second
> quarter and into the current third quarter, General Maritime has
> completed a number of important transactions aimed at increasing
> the company's liquidity and financial flexibility.

67.    Seemingly ignoring the auditors' report again, the above statement is false and

misleading in that Defendant Tavlarios knew and/or recklessly disregarded the fact that the

Company did not have a strong balance sheet, did not have financial flexibility, could not meet

its liquidity needs for the next year, needed additional financing, had a working capital deficit,

and was at risk of not continuing as a going concern.

68.    On July 28, 2011, the Company had a conference call addressing its second

quarter earnings announcement, during which Defendant Tavliaros made false and misleading

comments. Specifically, Tavlarios said, in pertinent part:

> Through the successful completion of a number of important
> transactions, we've increased the company's liquidity and financial
> flexibility, while reducing its near-term cash requirements.
> Specifically, we have raised over $250 million in capital, reduced
> the company's senior bank debt by $188 million, eliminated over
> $12 million of drydock costs through the execution of our fleet
> renewal program and amended and extended our credit facilities
> under favorable terms.

69.    The above statement is false and misleading in that Defendant Tavlarios knew

and/or recklessly disregarded the fact that the Company did not have a strong balance sheet, did

not have financial flexibility, could not meet its liquidity needs for the next year, needed

additional financing, had a working capital deficit, and, regardless of the Company's transactions

to try to improve financial flexibility and liquidity, was at risk of not continuing as a going

concern.

70.    On August 8, 2011, the Company filed an intentionally false and misleading Form

10-Q quarterly report with the SEC, for the second quarter of fiscal year 2011, ended June 30,

2011, signed by Defendant Pribor, and containing Sarbanes-Oxley Certifications signed by Defendants Tavlarios and Pribor. The Form 10-Q stated once again, in pertinent part, "We believe that our current cash balance as well as operating cash flows and proceeds from equity offerings will be sufficient to meet our liquidity needs for the next year."

71.     The above statement is false and misleading in that Defendants knew and/or recklessly disregarded the fact that the Company, among other serious concerns, could not meet its liquidity needs for the next year.

72.     On August 23, 2011, the Company filed a Form 8-K with the SEC relating that it had received a notice from the NYSE stating that the average per share price of the Company's common stock was below the NYSE's continued listing standard. The Form 8-K also states that the Company intended to notify the NYSE of its intention to cure the deficiency by effecting a reverse stock split.

73.     On October 3, 2011, the Company filed a Form 8-K with the SEC, signed by Defendant Pribor, and containing Sarbanes-Oxley Certifications signed by Defendants Tavlarios and Pribor, stating that the Company had entered into amendments to its credit facilities, including waiving the covenant regarding required minimum balance in cash, cash equivalents and revolver availability under each of the Credit Facilities through November 10, 2011. The Company would also be restricted from paying dividends through that date and the Company would also obligated to deliver updating information to its lenders regarding its cash flows and proposed restructuring plan.

74.     Notwithstanding the restrictions imposed on the Company, in the accompanying press release, Defendant Pribor characterized the amendments positively and stated:

> Management continues to take proactive measures to increase the Company's financial flexibility during a challenging market

> environment. We appreciate the ongoing support from our
> distinguished lending group and remain focused on pursuing
> opportunities to further strengthen our capital structure.

75.     The above statement was false and misleading in that Defendant Pribor knew

and/or recklessly disregarded the fact that the Company had run out of opportunities to increase

its financial flexibility and strengthen its capital structure. The amendment was not proactive; it

represented concessions that the Company had to make due to its precarious financial position.

76.     On November 2, 2011, the Company issued a press release summarizing its third

quarter and nine months 2011 financial results, stating, in part, that the Company recorded a net

loss of $55.1 million for the quarter compared to a net loss of $24.9 million for the prior year

period.

77.     On November 10, 2011, the Company filed a form NT 10-Q (notification of

inability to timely file Form-Q) with the SEC. The filing stated in pertinent part:

> General Maritime Corporation (the "Company") is engaged in
> ongoing discussions with lenders and certain holders of the
> Company's $300 million 12% Senior Notes which are due
> November 15, 2017 (the "Senior Notes") as well as other potential
> lenders, investors and strategic parties regarding alternatives for
> restructuring the Company's balance sheet and obtaining additional
> capital funding, which may include commencing a voluntary
> proceeding to reorganize under chapter 11 of the Bankruptcy Code.

78.     Based on the abundance of examples cited above, it is clear that throughout the

Class Period, Defendants issued press releases, Form 10-Ks, Form 10-Qs, and conducted

conference calls that were materially false and misleading concerning the Company's liquidity,

ability to take on debt, financial strength, and overall business prospects.

19

*The Truth is Revealed*

79.  Finally, on November 17, 2011, General Maritime disclosed, for the first time, the

full extent of its liquidity, debt, and overall financial problems when it filed a Form 8-K with the

SEC that stated the following, in pertinent part:

> On November 17, 2011, General Maritime Corporation (the
> "Company") and substantially all of its subsidiaries (collectively,
> the "Debtors") – with the exception of those in Portugal, Russia
> and Singapore, as well as certain inactive subsidiaries – filed
> voluntary petitions for relief (the "Chapter 11 Cases") under
> Chapter 11 of the United States Bankruptcy Code (the
> "Bankruptcy Code") in the United States Bankruptcy Court for the
> Southern District of New York (the "Bankruptcy Court"). The
> Debtors will continue to operate their businesses in the ordinary
> course as "debtors-in-possession" under the jurisdiction of the
> Bankruptcy Court in accordance with the applicable provisions of
> the Bankruptcy Code and orders of the Bankruptcy Court.

80.  Until this time, the Company had falsely and misleadingly failed to disclose the

full extent of its liquidity, debt, and overall financial problems to shareholders, and its stock,

accordingly, traded at artificially inflated levels.

81.  General Maritime's SEC filings during the Class Period were materially false and

misleading, and omitted material information concerning the Company's financial and business

viability.

82.  Defendants continually made false and materially misleading statements and

omissions during the Class Period concerning the Company's:

- liquidity;

- credit facilities;

- ability to meet its debt obligations;

- need to borrow money or seek alternative investments; and

- risk of not continuing as a going concern

83.    The Defendants' scheme was to engage in a highly leveraged and speculative purchase of tankers - at the risk and expense of shareholders - based on management's opinion that tanker earnings would improve sharply. When tanker earnings actually declined, Defendants issued repeated false and misleading statements about the Company's liquidity and financial ability to take on the purchase of the tankers, in order to ensure that the Company's stock would trade at inflated levels until the tanker earnings rebounded in their favor.

84.    The volume of General Maritime's continually repeated materially false and misleading statements as compared to the realities of its overall financial condition and business operations demonstrates a cogent and compelling inference of scienter.  Defendants had both the motive and opportunity to conduct fraud.  They also had actual knowledge of the misleading nature of the statements made or acted in reckless disregard of the true information known to them at the time.

## NO SAFE HARBOR

85.    The statutory safe harbor provided for certain forward-looking statements does not apply to any of the false statements alleged in this Complaint.  None of the statements alleged herein are "forward-looking" statements and no such statement was identified as a "forward-looking statement" when made.  Rather, the statements alleged herein to be false and misleading all relate to facts and conditions existing at the time the statements were made. Moreover, cautionary statements, if any, did not identify important factors that could cause actual results to differ materially from those in any forward-looking statements.

86.    In the alternative, to the extent that the statutory safe harbor does apply to any statement pleaded herein which is deemed to be forward-looking, the Defendants are liable for

such false forward-looking statements because at the time each such statement was made, the speaker actually knew and/or recklessly disregarded the fact that such forward-looking statements were materially false or misleading and/or omitted facts necessary to make statements previously made not materially false and misleading, and/or that each such statement was authorized and/or approved by a director and/or executive officer of General Maritime who actually knew or recklessly disregarded the fact that each such statement was false and/or misleading when made. None of the historic or present tense statements made by the Defendants was an assumption underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such an assumption underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the Defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

**LOSS CAUSATION/ECONOMIC LOSS**

87.     During the Class Period, the Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated General Maritime's stock price and operated as a fraud or deceit on purchasers of General Maritime common stock by misrepresenting the Company's financial condition and liquidity position. Once the Defendants' misrepresentations and fraudulent conduct were disclosed to the market, General Maritime's stock price reacted negatively as the artificial inflation was removed from it. As a result of his purchases of General Maritime stock during the Class Period, Plaintiff and other members of the Class suffered economic loss.

88.     The Defendants' false and misleading statements had the intended effect and caused General Maritime stock to trade at artificially inflated levels throughout the Class Period.

89.    As investors and the market became aware of General Maritime's prior misstatements and omissions, General Maritime's stock price reacted negatively, damaging investors.

### APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

90.    At all relevant times, the market for General Maritime's common stock was an efficient market for the following reasons, among others:

(a)    General Maritime's stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient market;

(b)    During the class period, General Maritime stock was actively traded, demonstrating a very strong presumption of an efficient market;

(c)    As a regulated issuer, General Maritime filed with the SEC periodic public reports during the Class Period;

(d)    General Maritime regularly communicated with public investors via established market communication mechanisms;

(e)    General Maritime was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales forces and certain customers of their respective brokerage firms during the Class Period. Each of these reports was publicly available and entered the public marketplace; and

(f)    Unexpected material news about General Maritime was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

91.    As a result of the foregoing, the market for General Maritime's common stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in General Maritime's stock price.    Under these

circumstances, all purchasers of General Maritime's common stock during the Class Period suffered similar injury through their purchases of General Maritime's common stock at artificially inflated prices, and a presumption of reliance applies.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

92.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all persons who purchased common stock of General Maritime during the Class Period and who were damaged thereby. Excluded from the Class are Defendants, the current and former officers and directors of the Company, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

93.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, General Maritime's securities were actively traded on the NYSE. According to *Bloomberg*, as of May 8, 2012 the Company had 121,705,048 shares outstanding. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds of members in the proposed Class. Members of the Class may be identified from records maintained by General Maritime or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice customarily used in securities class actions.

94.    Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

95.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

96.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    whether the misstatements alleged herein were made with scienter;

(c)    whether statements made by the Defendants to the investing public during the Class Period misrepresented material facts about the liquidity, business, prospects, sales, operations and management of General Maritime; and

(d)    to what extent the members of the Class have sustained damages and the proper measure of damages.

97.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to redress individually the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## FIRST CLAIM

### Violation of Section 10(b) of
### The Exchange Act Against and Rule 10b-5
### Promulgated Thereunder Against Defendants

98.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

99.    During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to, and throughout the Class Period, did: (1) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (2) cause Plaintiff and other members of the Class to purchase and/or sell General Maritime's securities at artificially inflated and distorted prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, individually and in concert, took the actions set forth herein.

100.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of General Maritime as specified herein.

101.    These Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of General Maritime's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about General Maritime and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a

course of business that operated as a fraud and deceit upon the purchasers of General Maritime's securities during the Class Period.

102.    Each of the Defendants' primary liability, and controlling person liability, arises from the following facts: (1) the Defendants were high-level executives, directors, and/or agents at the Company during the Class Period and members of the Company's management team or had control thereof; (2) each of the Defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's financial condition; (3) each Defendant enjoyed significant personal contact and familiarity with the other Defendant and was advised of and had access to other members of the Company's management team, internal reports, and other data and information about the Company's finances, operations, and sales at all relevant times; (4) each of the Defendants was aware of the Company's dissemination of information to the investing public that they knew or recklessly disregarded was materially false and misleading; and (5) each of the Defendants culpably participated in the wrongful conduct alleged herein.

103.    Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing General Maritime's financial condition, liquidity, and future business prospects from the investing public and supporting the artificially inflated or distorted price of its securities.    As demonstrated by Defendants' overstatements and misstatements of the Company's financial condition, liquidity, and business prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations

27

and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

104.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price for General Maritime's common stock was artificially inflated during the Class Period.  In ignorance of the fact that market prices of General Maritime's publicly-traded common stock were artificially inflated or distorted, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the Company's securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired and/or sold General Maritime common stock during the Class Period at artificially high prices and were damaged thereby.

105.    At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding General Maritime's financial condition and liquidity, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired General Maritime securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices or distorted prices at which they did.

106.    By virtue of the foregoing, the Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

28

107.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

108.    This action was filed within two years of discovery of the fraud and within five years of Plaintiff's purchases of securities giving rise to the cause of action.

## SECOND CLAIM

### Violation Of Section 20(a) of
### The Exchange Act Against the Defendants

109.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

110.    This Second Claim is asserted against each of the Defendants.

111.    The Defendants acted as controlling persons of General Maritime within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, agency, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of aspects of the Company's revenues and earnings and dissemination of information to the investing public, the Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiff contends are false and misleading.  The Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

29

112.    In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

113.    As set forth above, the Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.

114.    By virtue of their positions as controlling persons, the Defendants are liable pursuant to Section 20(a) of the Exchange Act as they culpably participated in the fraud alleged herein.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

115.    This action was filed within two years of discovery of the fraud and within five years of Plaintiff's purchases of securities giving rise to the cause of action.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

A.    Determining that this action is a proper class action, designating Plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure;

B.    Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.    Such other and further relief as the Court may deem just and proper.

30

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: June 27, 2012                    Respectfully submitted,

                                        **WOLF HALDENSTEIN ADLER**
                                        **FREEMAN & HERZ LLP**

                                        Gregory M. Nespole
                                        Mark Rifkin
                                        Matthew Guiney
                                        270 Madison Avenue
                                        New York, New York 10016
                                        Telephone: (212) 545-4600
                                        Facsimile: (212) 686-0114

                                        ***Counsel for Plaintiff***

691286

31

CERTIFICATION OF NAMED PLAINTIFF
PURSUANT TO FEDERAL SECURITIES LAWS

Marshall T. stewart, Jr. ("Plaintiff") declares:

1.    Plaintiff has reviewed a complaint and authorized its filing.

2.    Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.    Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.    Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| Security | Transaction | Date | Price Per Share |
|----------|-------------|------|-----------------|

*See* attached Schedule A.

5.    Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:

NONE

6.    The Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _26_ day of June, 2012.

Marshall T. Stewart, Jr.

# SCHEDULE A

Marshall T. Stewart, Jr. GMR Purchases

| Date | Action | Quantity | Symbol | Description | | Price |
|------|--------|----------|--------|-------------|---|-------|
| 8/30/2011 | Buy | 1600 | GMR | GEN MARITIME CORP NEW | F | $0.38 |
| 8/22/2011 | Buy | 1100 | GMR | GEN MARITIME CORP NEW | F | $0.55 |
| 8/22/2011 | Buy | 400 | GMR | GEN MARITIME CORP NEW | F | $0.54 |
| 8/8/2011 | Buy | 400 | GMR | GEN MARITIME CORP NEW | F | $0.60 |
| 8/8/2011 | Buy | 2000 | GMR | GEN MARITIME CORP NEW | F | $0.69 |
| 7/8/2011 | Buy | 2000 | GMR | GEN MARITIME CORP NEW | F | $1.16 |
| 5/19/2011 | Buy | 700 | GMR | GEN MARITIME CORP NEW | F | $1.95 |
| 5/19/2011 | Buy | 300 | GMR | GEN MARITIME CORP NEW | F | $1.95 |
| 5/12/2011 | Buy | 750 | GMR | GEN MARITIME CORP NEW | F | $2.08 |
| 3/24/2011 | Buy | 750 | GMR | GEN MARITIME CORP NEW | F | $2.00 |